**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

CHANEL WILEY,

*Defendant-Appellant*.

No. 22-50235

D.C. No.
2:20-cr-00298-
JAK-2

OPINION

Appeal from the United States District Court
for the Central District of California
John A. Kronstadt, District Judge, Presiding

Argued and Submitted February 6, 2024
Pasadena, California

Filed May 29, 2024

Before: John B. Owens, Patrick J. Bumatay, and Salvador
Mendoza, Jr., Circuit Judges.

Opinion by Judge Owens;
Concurrence by Judge Mendoza

## SUMMARY[*]

### Criminal Law

The panel affirmed a conviction in a case in which Chanel Wiley contended that, during jury selection, her ankle monitor started beeping, thereby prejudicing her and warranting a new trial.

The panel assumed, without resolving, that at least one juror concluded that the beeping sound meant Wiley was wearing an ankle monitor.

The panel held that the shackles in *Deck v. Missouri*, 544 U.S. 622 (2005), and the ankle monitor in this case are two very different things, and ankle monitors are not entitled to *Deck*'s presumption of prejudice. The panel held that ankle monitors are also not inherently prejudicial under *Holbrook v. Flynn*, 475 U.S. 560 (1986). Consequently, Wiley was required to prove actual prejudice to sustain her claim. The panel held that, even if a juror knew the beeping sound came from the monitor, Wiley failed to prove that she was actually prejudiced.

The panel addressed the defendant's sufficiency-of-the-evidence claim in a concurrently filed memorandum disposition.

Concurring in the judgment, Judge Mendoza wrote that the record does not reflect that any juror perceived Wiley's ankle monitor, which forecloses Wiley's due process argument and should have ended the panel's analysis. He

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

disagreed with the majority's decision to assume that critical fact in an effort to reach a due process issue. He wrote that although he generally agrees that an ankle monitor is not quite a "shackle," he believes that a perceptible ankle monitor is inherently prejudicial, undermining the presumption of innocence and eroding the fairness of the fact-finding process.

## COUNSEL

A. Carley Palmer (argued), David Y. Pi and Elia Herrera, Assistant United States Attorneys; Bram M. Alden, Assistant United States Attorney, Criminal Appeals Section Chief; E. Martin Estrada, United States Attorney; United States Department of Justice, Office of the United States Attorney, Los Angeles, California; for Plaintiff-Appellee.

Verna J. Wefald (argued), Pasadena, California, for Defendant-Appellant.

**OPINION**

OWENS, Circuit Judge:

Chanel Wiley appeals from her conviction for conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 846. She contends that, during jury selection, her ankle monitor started beeping, thereby prejudicing her and warranting a new trial. We hold that, even if a juror knew the beeping sound came from the monitor, an ankle monitor is not inherently prejudicial. And because Wiley has not shown actual prejudice, we affirm.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Ankle Monitor

Federal agents arrested Wiley for trafficking a small amount of methamphetamine, and an indictment soon followed. Wiley was released on bond pending trial but struggled with pretrial supervision and eventually was arrested again. Rather than forfeit the bond (which would have cost her surety their family home), the magistrate judge ordered Wiley to wear an electronic ankle monitor "to make sure [she] show[ed] up for court . . . ." The monitor, which the judge described as "the size of a cell phone," permitted Wiley to avoid detention and tracked her location at all times. Wiley wore her monitor as prescribed, including when she attended court hearings and at trial.

---

[1] Wiley also challenges the sufficiency of the evidence supporting her conviction. We address this claim in a concurrently filed memorandum disposition, in which we affirm.

## B. Jury Selection and Trial

On the first day of trial, shortly before jury selection began, defense counsel told the district judge that the ankle monitor "keeps giving out audible alerts, and we're afraid that would be prejudicial to the jury." The judge acknowledged hearing the alert and asked if the "device [could] be muted." The case agent assisting the prosecution offered to help, and the judge directed him to the Pretrial Services Office, which oversees court-ordered supervision for defendants, including ankle monitors.

Jury selection began without any objection, though, at the outset, a prospective juror indicated that "some of them" were having difficulty hearing the judge. About an hour into the process, defense counsel asked for a sidebar and told the judge that the "ankle monitor keeps alerting," and that "every juror on this side is hearing it and seeing I have to fiddle with it." The judge disagreed, explaining that, although he also had heard the alert, he did not "think anyone really knows what that sound is." The case agent then reported that Pretrial Services had turned off the monitor, which he believed would stop the beeping. But he said that he could cut off the monitor if needed. The judge instructed the agent to cut off the monitor at the next break in the proceedings, unless it beeped again, in which case the judge would order a recess so that it could be removed immediately. Again without objection, jury selection resumed.

A few minutes later, a different juror said he could not hear the judge. The judge then told the jurors that the court would take a "short break" to "address this technical issue." During the recess, outside the presence of the jurors, the

agent removed the monitor from Wiley and took it outside the courtroom.

Jury selection resumed, a jury and alternates were picked, and the trial began. The jury convicted Wiley of conspiracy to distribute methamphetamine and acquitted her of distributing methamphetamine. Wiley received a below Guidelines sentence of sixteen months' imprisonment. She filed a timely notice of appeal.

## II. DISCUSSION

### A. Juror Awareness of the Ankle Monitor

As a threshold matter, we assume that at least one juror concluded that the beeping sound meant that Wiley was wearing an ankle monitor. The district judge acknowledged hearing the noise and did not dispute that the jurors also could hear it.

Indeed, during the period when Wiley was wearing the beeping ankle monitor, more than one juror reported difficulty hearing the judge. One such complaint eventually prompted the judge to order a recess and have the ankle monitor removed. Once the monitor was removed, the jurors' complaints that they were having difficulty hearing ceased. Finally, defense counsel "fiddle[d]" with the ankle monitor in view of the jurors. This evidence indicates that the jurors heard the beeping noise and knew it was coming from Wiley's ankle monitor.

According to our colleague's concurrence, while "ankle monitors are the exact type of courtroom practice that catch[es] jurors' attention in a courtroom," the jurors in *this* courtroom had no knowledge of Wiley's ankle monitor. The concurrence asserts that the recess merely provided a "convenient opportunity to have Wiley's ankle monitor

removed" but ignores that removing the beeping ankle monitor was the first order of business during the recess. The concurrence also argues that the second juror who reported difficulty hearing could not hear because of an issue with his assistive headphones, not the ankle monitor. The record may be unclear as to the source of the sound problems for that juror, but we need not resolve that factual question. Viewed as a whole, the record contains sufficient evidence that the ankle monitor was perceptible to the jury.

## B. Standard of Review and Prejudice

We review de novo Wiley's claim that her right to a fair trial was violated because members of the jury knew she was subject to government restraint. *See United States v. Halliburton*, 870 F.2d 557, 558 (9th Cir. 1989) ("Whether a defendant's right to a fair trial is violated because members of the jury observe him in handcuffs is a question of law that is reviewed independently without deference to the district court's determination of this issue.").

In *Holbrook v. Flynn*, 475 U.S. 560 (1986), the Supreme Court established a framework for determining the level of prejudice attendant to the jury's observation of a defendant under government restraint or security measure. *See id.* at 568–72; *Hayes v. Ayers*, 632 F.3d 500, 521 (9th Cir. 2011) (discussing the *Holbrook* framework). First, courts must "look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial." *Hayes*, 632 F.3d at 521 (quoting *Holbrook*, 475 U.S. at 572). "In assessing inherent prejudice, the question is 'whether an unacceptable risk is presented of impermissible factors coming into play' in the jury's evaluation of the defendant." *Id.* (quoting *Holbrook*, 475 U.S. at 570). Next, "[i]f security

measures are not found to be inherently prejudicial, a court . . . considers whether the measures actually prejudiced members of the jury." *Id.* at 521–22 (citing *Holbrook*, 475 U.S. at 572). "[I]f the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." *Id.* at 522 (alteration in original) (quoting *Holbrook*, 475 U.S. at 572).

At step one of this inquiry—"assessing inherent prejudice"—the Court has deemed some government restraints presumptively prejudicial. *See Halliburton*, 870 F.2d at 560 ("The Supreme Court has distinguished the discrete levels of prejudice that may result from a jury's viewing an accused under government restraint. Compelling an accused to appear in prison attire before a jury presents 'an unacceptable risk' of prejudice." (quoting *Estelle v. Williams*, 425 U.S. 501, 504–09 (1976))). Wiley argues that her ankle monitor falls within one such category—visibly shackling a defendant during trial—and thus contends that she need not demonstrate actual prejudice to make out a due process violation.[2]

---

[2] The government argues that Wiley's due process claim should be subject to plain error review because Wiley "advised the court of the audible beeping, but she did not ask the court to take any action or object to the court's proposed solutions." However, plain error review is inappropriate because defense counsel twice raised the issue of the beeping ankle monitor and told the district judge that he was concerned Wiley had been "prejudiced." Consequently, Wiley preserved this argument. *See United States v. Rodriguez*, 880 F.3d 1151, 1159 (9th Cir. 2018) ("[A]n error is preserved when the substance of the objection was 'patently' clear, even if defense counsel did not use the precise terms used on appeal." (quoting *United States v. Ward*, 747 F.3d 1184, 1189 (9th Cir. 2014))).

The leading case on visible shackling is *Deck v. Missouri*, 544 U.S. 622 (2005), in which the Court held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Id.* at 629. While we are mindful of *Deck* (and will review it below), we conclude that the shackles in *Deck* and the ankle monitor in this case are two very different things, and ankle monitors are not entitled to *Deck*'s presumption of prejudice. Nor are ankle monitors inherently prejudicial under *Holbrook.* Consequently, Wiley must prove actual prejudice to sustain her claim. *See United States v. Olano*, 62 F.3d 1180, 1190 (9th Cir. 1995) (holding that, where a restraint is not "inherently or presumptively prejudicial," defendant "must demonstrate actual prejudice to establish a constitutional violation" (citation omitted)).

## C. *Deck*'s Rule Concerning Shackles Does Not Apply to Ankle Monitors.

*Deck* rooted the constitutional prohibition on routine visible shackling in the English common law rule against trying a defendant in irons. 544 U.S. at 626–27 (first quoting 4 W. Blackstone, Commentaries on the Laws of England 317 (1769) ("[I]t is laid down in our antient books, that, though under an indictment of the highest nature, [the prisoner] must be brought to the bar without irons, or any manner of shackles or bonds; unless there be evident danger of an escape."); and then quoting 3 E. Coke, Institutes of the Laws of England *34 (1644) ("If felons come in judgement to answer, . . . they shall be out of irons, and all manner of bonds, so that their pain shall not take away any manner of reason, nor them constrain to answer, but at their free will.")). The Court determined that this rule had been

adopted by state and federal courts beginning in the nineteenth century and represented "a principle deeply embedded in the law." *Id.* at 626–29.

*Deck* acknowledged that the English common law rule may "primarily have reflected concern for the suffering . . . that 'very painful' chains could cause," which could compromise a defendant's ability to defend himself. *Id.* at 630; *see also Trial of Christopher Layer*, 16 How. St. Tr. 94, 99 (K.B. 1722) (statement of Mr. Hungerford) ("[T]he reason why [irons] are taken off in the course of proceeding against [a prisoner] in a court of justice, it seems to be, that his mind should not be disturbed by any uneasiness his body or limbs should he [sic] under . . . ."). The Court nevertheless extended the common law rule to less painful and less cumbersome modern shackles based on "three fundamental legal principles" emphasized in the Supreme Court's more recent cases. *Deck*, 544 U.S. at 630.

First, "[v]isible shackling undermines the presumption of innocence" because "[i]t suggests to the jury that the justice system itself sees a 'need to separate a defendant from the community at large.'" *Id.* (quoting *Holbrook*, 475 U.S. at 569). Second, shackling diminishes the right to counsel because "[s]hackles can interfere with the accused's 'ability to communicate' with his lawyer." *Id.* at 631 (quoting *Illinois v. Allen*, 397 U.S. 337, 344 (1970)). Third, "the use of shackles at trial 'affront[s]' the 'dignity and decorum of judicial proceedings that the judge is seeking to uphold.'" *Id.* (alteration in original) (quoting *Allen*, 397 U.S. at 344).

The common law rule identified in *Deck* does not apply to ankle monitors. Blackstone described the common law requirement that the defendant "be brought to the bar without irons, or any manner of shackles or bonds."

Blackstone, *supra*, at 317. The Oxford English Dictionary Online's first definition of "shackle" is a "kind of fetter," which it further defines as a "fetter for the ankle or wrist of a prisoner, usually one of a pair connected together by a chain, which is fastened to a ring-bolt in the floor or wall of the cell." *Shackle*, Oxford English Dictionary Online[3] (dating definition of singular form of shackle to Old English and plural form to 1540). The second definition of "shackle" is a "figurative" definition: "[a]pplied to restraint on freedom of action." *Id.* (dating definition to approximately 1225).

Likewise, the Oxford English Dictionary Online's first definition of "bond" is a "literal" definition: "[t]hat with or by which a thing is bound," which it further defines as "[a]nything with which one's body or limbs are bound in restraint of personal liberty; a shackle, chain, fetter, manacle." *Bond*, Oxford English Dictionary Online[4] (dating definition to approximately 1325). It also includes a "figurative" definition of "bond": a "restraining or uniting force," that is, "[a]ny circumstance that trammels or takes away freedom of action; a force which enslaves the mind through the affections or passion." *Id.* (dating definition to approximately 1325).

An ankle monitor is not a "shackle" or "bond" in the literal sense. It does not physically bind an individual's "body or limbs" or tie her to "the floor or wall." An ankle monitor does, however, "restrain[]" an individual's

---

[3]

https://www.oed.com/dictionary/shackle_n1?tab=meaning_and_use#23093646 (last visited May 15, 2024).

[4]

https://www.oed.com/dictionary/bond_n2?tab=meaning_and_use#16802519 (last visited May 15, 2024).

"freedom of action" because a defendant wearing an ankle monitor faces nonphysical limitations on where she may go: She is subject to location monitoring and therefore disincentivized from going anywhere that would violate the terms of her bail conditions.

But, even if an ankle monitor falls within the figurative definition of shackle or bond, extending the prohibition on visible shackling to ankle monitors would not accord with the original basis for the common law rule; Wiley has not alleged, nor is there any evidence to suggest, that an ankle monitor causes pain or interferes with a defendant's ability to represent herself. *Cf. Trial of Christopher Layer*, 16 How. St. Tr. at 100 ("[T]he authority is that he is not to be in vinculis during his trial, but should be so far free, that he should have the use of his reason, and all advantages to clear his innocence."); *id.* at 129 (statement of Mr. Hungerford) ("The poor man bath [sic] been so oppressed by these chains, that he was not able to prepare his brief.").

Nor do ankle monitors pose the same risks as shackling to *Deck*'s three legal principles.

### i.   The Presumption of Innocence

First, compared to shackling, the knowledge that a defendant is wearing an ankle monitor does not create the same perception of the defendant—and thus does not pose the same constitutional risk to the presumption of innocence.

*Deck*'s conclusion that shackling undermines a defendant's presumption of innocence rested on the association between shackling and dangerousness. The Court reasoned that shackling threatens a jury's ability to make impartial decisions by creating the perception that the defendant is a "danger to the community." 544 U.S. at 633.

That is why *Deck* also extended the prohibition on routine visible shackling to the penalty phase of a capital trial, where the presumption of innocence does not apply. *Id.*; *cf. Claiborne v. Blauser*, 934 F.3d 885, 897 (9th Cir. 2019) (extending *Deck* to Section 1983 trials, where the presumption of innocence does not apply, because "where a plaintiff's dangerousness is a merits issue, visible shackling violates due process unless justified on a case-by-case basis").

Similar logic led us to hold that *Deck*'s presumptive-prejudice rule applies only to shackling in the courtroom. *See Wharton v. Chappell*, 765 F.3d 953, 967 (9th Cir. 2014) ("[T]he fact that Petitioner was *not* shackled in the courtroom, even though he was shackled entering and exiting the courthouse, suggested that Petitioner was *not* a dangerous person."). We have further recognized that "[n]ot all restraints are created equal." *Walker v. Martel*, 709 F.3d 925, 942 (9th Cir. 2013). "'[T]he greater the intensity of shackling . . . the greater the extent of prejudice,' because elaborate physical restraints are more likely to create the appearance of the defendant's dangerousness." *Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th Cir. 2008) (alterations in original) (quoting *Spain v. Rushen*, 883 F.2d 712, 722 (9th Cir. 1989)).

Compared to shackling, ankle monitors are relatively unobtrusive and do not "create the appearance of the defendant's dangerousness." *Id.* Unlike shackling, which suggests a "proclivity for violence," *Walker*, 709 F.3d at 942, ankle monitors are primarily used to guard against a

defendant's flight risk.**[5]**   Indeed, that is why Wiley was subject to ankle monitoring in this case.

Therefore, an ankle monitor merely indicates a defendant's custody status.  *See Wharton*, 765 F.3d at 965 ("[J]urors know that, as a matter of routine, some defendants are in custody during trial and that security needs during transport demand restraints."); *Walker*, 709 F.3d at 942 (stating that a restraint that "only suggest[s] . . . custody status" is less prejudicial than more extensive restraints that, for example, bind a defendant's hands); *cf. Holbrook*, 475 U.S. at 567 ("Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, we . . . could never hope[] to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct.").

True, the awareness that a defendant is wearing an ankle monitor may impact the jury's perception of that defendant's innocence.   As the Supreme Court has held, "the State

---

[5] *See United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) ("[E]lectronic monitoring, while valuable in pretrial release cases (especially in allowing early detection of possible flight), cannot be expected to prevent a defendant from committing crimes or deter him from participating in felonious activity within the monitoring radius."); *Miranda v. Garland*, 34 F.4th 338, 350 n.4 (4th Cir. 2022) ("[Petitioner's] flight risk . . . could be mitigated by ordering [him] to wear a GPS ankle monitor as a condition of release."); United States Courts, *Federal Location Monitoring*, https://www.uscourts.gov/services-forms/probation-and-pretrial-services/supervision/federal-location-monitoring (last visited May 15, 2024) ("Location monitoring allows people on supervision to remain in the community and begin to rebuild their lives . . . GPS technology also can be used to verify that an individual is in an authorized location or is in or near an unauthorized location.").

cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes" because "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment." *Estelle*, 425 U.S. at 504–05, 512. But "identifiable prison clothes" are more prejudicial than an ankle monitor because prison clothes, like shackling, go to the issue of dangerousness. Prison clothes signal that a defendant is detained and thereby "suggest[] to the jury that the justice system itself sees a 'need to separate a defendant from the community at large.'" *Deck*, 544 U.S. at 630 (quoting *Holbrook*, 475 U.S. at 569). By contrast, a defendant will be subject to an ankle monitor only if the justice system has determined that the defendant does *not* "need to [be] separate[d] . . . from the community at large," *id.* (quoting *Holbrook*, 475 U.S. at 569), and thus can be released on bail subject to the electronic monitoring condition. *See* Samuel R. Wiseman, *Pretrial Detention and the Right to be Monitored*, 123 Yale L.J. 1344, 1350 (2014) (proposing a right to be monitored for defendants "who would otherwise be detained for risk of flight, not for dangerousness").

Our concurring colleague disagrees and believes ankle monitors "separate a defendant from the community at large" because they may be used to ensure that a defendant complies with a state-imposed curfew or house arrest. But a defendant kept at home by her ankle monitor is still allowed to go home. Ankle monitors may vary in the degree to which they restrict a defendant's freedom of movement—but they still preserve some freedom of movement. And it is only defendants who are not detained for dangerousness that will be eligible for that freedom in the first place. Therefore, contrary to our concurring colleague's assertion, ankle

monitors do not "brand[] the defendant as an especially dangerous and culpable person." Accordingly, they do not threaten the presumption of innocence in the same way as shackling.

### ii.  The Right to Counsel

Turning to the second legal principle identified in *Deck*, no evidence suggests that ankle monitors interfere with a defendant's right to counsel. *See* 544 U.S. at 631. As noted, ankle monitors are not so painful or cumbersome as to discourage a defendant from taking the stand on her own behalf or to impair the full exercise of her mental faculties. *See id*. And, unlike shackles, they do not reduce a defendant's "ability to communicate with . . . counsel" because they do not place a defendant in "a condition of total physical restraint." *Allen*, 397 U.S. at 344.

### iii.  The Dignity of Judicial Proceedings

Finally, an ankle monitor does not "'affront[]' the 'dignity and decorum of judicial proceedings that the judge is seeking to uphold.'" *Deck*, 544 U.S. at 631 (quoting *Allen*, 397 U.S. at 344). Ankle monitors are much less conspicuous and disruptive than the examples the Supreme Court has previously determined threaten the courtroom's formal dignity. *See id.* at 631–32 ("'hav[ing] a man plead for his life' in shackles before 'a court of justice'" (quoting *Trial of Christopher Layer*, 16 How. St. Tr. at 99 (statement of Mr. Hungerford))); *Allen*, 397 U.S. at 344 (binding and gagging a defendant in the presence of the jury).

***

In sum, neither the common law rule nor the three fundamental legal principles underlying *Deck*'s holding apply with equal force to ankle monitors.

**D. Ankle Monitors Are Also Not Inherently Prejudicial Under *Holbrook*.**

Having concluded that *Deck*'s categorical rule does not apply to ankle monitors, we instead apply *Holbrook*'s analysis.   Ankle monitors are not inherently prejudicial under this test either.

*Holbrook* asks whether security measures "tend[] to brand [the defendant] in [the jurors'] eyes with an unmistakable mark of guilt" or "create 'an unacceptable risk . . . of impermissible factors coming into play.'"  *Williams v. Woodford*, 384 F.3d 567, 588 (9th Cir. 2004) (alterations in original) (quoting *Holbrook*, 475 U.S. at 571).   We have previously applied this standard to conclude that the following forms of government restraint or courthouse security measures were *not* inherently prejudicial: (1) "brief and inadvertent observation by jurors of a defendant in handcuffs outside the courtroom," *Halliburton*, 870 F.2d at 560; *see also Wharton*, 765 F.3d at 964 (same); *Williams*, 384 F.3d at 593 (holding that "the juror's viewing of Williams in handcuffs with a coat draped over his handcuffed hands as he went to or from the courtroom was not inherently or presumptively prejudicial"); *Ghent v. Woodford*, 279 F.3d 1121, 1133 (9th Cir. 2002) (holding that there was no inherent prejudice when "a few jurors . . . glimpsed Ghent in shackles in the hallway and as he was entering the courtroom"); *Olano*, 62 F.3d at 1190 (holding that there was no inherent prejudice "even if some jurors had seen Olano's handcuffs" as he entered the courtroom); (2) the deployment of more than the usual number of courtroom marshals, *Williams*, 384 F.3d at 587–89; and (3) the use of a courtroom with a "wire-reinforced glass partition and bars separating the spectator area from the

court area," *Morgan v. Aispuro*, 946 F.2d 1462, 1463–65 (9th Cir. 1991).

*Holbrook* and its progeny establish that jurors understand that some security measures are required at courthouses, so such measures are not inherently prejudicial unless they impermissibly suggest guilt. An ankle monitor easily satisfies this test for reasons similar to why an ankle monitor is not a shackle. Indeed, as this case proves, an ankle monitor—which permitted Wiley to enter the courthouse through the same security as the jurors, ride the same elevators, and enter the courtroom through the same door as the jurors—makes clear that the defendant is not a dangerous person.

Our concurring colleague disagrees and concludes that ankle monitors are inherently prejudicial under *Holbrook* because "when a defendant wears an ankle monitor to court, it distinguishes her from everybody else in the courtroom." But the defendant is already distinguished from everybody else in the courtroom because she is *the defendant*. *Holbrook* acknowledged that "the right to a fair trial . . . does not mean . . . that every practice tending to single out the accused from everyone else in the courtroom must be struck down." 475 U.S. at 567. Therefore, a security measure prejudices a defendant only if it suggests something worse about her than that she is "associate[d] . . . with the criminal justice system."

Our concurring colleague attempts to distinguish ankle monitors from other security measures we have upheld, such as security screenings for all spectators, *see Hayes*, 632 F.3d at 521–22, and the use of a security courtroom, *Morgan*, 946 F.2d at 1465, by arguing that those measures were "generalized" and "appl[ied] indiscriminately." But our

colleague neglects cases where we upheld security measures that were not generalized. Consider the cases where jurors saw defendants in handcuffs outside the courtroom. *See Halliburton*, 870 F.2d at 560; *Wharton*, 765 F.3d at 964; *Williams*, 384 F.3d at 593; *Ghent*, 279 F.3d at 1133; *Olano*, 62 F.3d at 1190. These cases indicate that restraints that are short of in-courtroom shackles—including, as we conclude, ankle monitors—need not be "interpreted as a sign that [the defendant] is particularly dangerous or culpable." *Holbrook*, 475 U.S. at 569.

The fact that the defendants in those cases wore handcuffs outside the courtroom, whereas Wiley wore her ankle monitor inside the courtroom, is of no import. The distinction between inside- and outside-the-courtroom restraints only matters in the context of handcuffs because, unlike ankle monitors, handcuffs are much more like literal shackles: They are "fetter[s] for the . . . wrist of a prisoner . . . of a pair connected together by a chain," *Shackle*, Oxford English Dictionary Online, *supra*, that bind "one's body or limbs . . . in restraint of personal liberty," *Bond*, Oxford English Dictionary Online, *supra*. Thus, handcuffs are more likely to fall within *Deck*'s rule.[6] By contrast, even in the

---

[6] *See United States v. Cazares*, 788 F.3d 956, 965 (9th Cir. 2015) ("In the presence of the jury, [the defendant] is ordinarily entitled to be relieved of handcuffs, or other unusual restraints, so as not to mark him as an obviously bad man or to suggest that the fact of his guilt is a foregone conclusion." (alteration in original) (quoting *Stewart v. Corbin, 850 F.2d 492, 497 (9th Cir. 1988)*)); *Larson*, 515 F.3d at 1064 (in the process of applying *Deck* to a security leg brace and determining that there was no prejudice, stating that "physical restraints such as . . . handcuffs may create a more prejudicial appearance than more unobtrusive forms of restraint"); *United States v. Miller*, 531 F.3d 340,

courtroom, ankle monitors do not pose the same risk of prejudice.

An ankle monitor is also far less intrusive than having a phalanx of guards in the courtroom (which the court upheld in *Holbrook*) and not in the same galaxy as prison clothes or shackles. To fault us for "confus[ing] disruption and prejudice," our concurring colleague cites *Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999). But *Rhoden* is a pre-*Deck* shackling case where the defendant was subject to an intrusive restraint: He was forced to wear a leg brace that caused him "physical . . . pain." *Id.* at 637. Thus, *Rhoden* does not prove that we should ignore how intrusive a restraint is in determining whether it is inherently prejudicial.

As a result, we conclude that ankle monitors are not inherently prejudicial under *Holbrook*. While there appears to be little case law on this issue, nothing contradicts this view. *See White v. United States*, No. 23-1451, 2023 WL 7550935, at \*4 (6th Cir. Oct. 17, 2023) (holding that defense counsel's failure to request a mistrial when defendant's ankle monitor went off in the jury's presence was not ineffective assistance of counsel warranting 28 U.S.C. § 2255 relief because "even if the jury did perceive the alarm, 'brief, inadvertent observation of a defendant in custody does not compel reversal in the absence of an affirmative showing of actual prejudice'" (quoting *United*

---

345 (6th Cir. 2008) ("*Deck*, and the bulk of federal cases discussing the use of physical restraints during trial and sentencing, involved traditional methods of securing the accused, *such as handcuffs* and shackles." (emphasis added)); *United States v. Barrera-Medina*, 139 F. App'x 786, 796 n.3 (9th Cir. 2005) (noting that "the term 'shackle' implies the use of handcuffs and metal chains").

*States v. Fredericks*, 684 F. App'x 149, 164–65 (3d Cir. 2017))); *Higgins v. Addison*, 395 F. App'x 516, 519 (10th Cir. 2010) ("Even assuming the ankle monitor was worn during trial and was visible to the jury, Higgins has not identified any Supreme Court holding expressly extending the general prohibition on restraining a criminal defendant with visible shackles to the factual situation presented here.").

### E. Wiley Has Not Proved That Her Ankle Monitor Actually Prejudiced Her.

Because an ankle monitor is not inherently prejudicial, Wiley must show actual prejudice to prevail on her claim. *See, e.g.*, *Olano*, 62 F.3d at 1190. She has failed to carry this burden.

The district judge's thoughtful approach to handling the issue of the beeping ankle monitor, to which defense counsel never objected, was appropriate. Shortly after the judge learned that the agent could remove the device, the judge directed the agent to do so at the next recess. *See, e.g.*, *Halliburton*, 870 F.2d at 561–62 (where jurors briefly observed defendant in handcuffs outside the courtroom but district court "took affirmative steps to make it appear to the jurors that [defendant] was no longer in custody," "district court's immediate and appropriate curative measures eliminated the risk of actual prejudice to [defendant's] right to a fair trial"). When the ankle monitor beeped again, the judge immediately ordered a recess and had the ankle monitor removed outside the presence of the jury.

No one objected to the judge's resolution of the issue, and nothing suggests that Wiley was prejudiced in any way. Defense counsel did not ask to voir dire the jurors. *See, e.g.*, *id.* at 561 ("The most certain method to show that actual

prejudice resulted would have been to conduct a voir dire of the two jurors who saw [the defendant] in handcuffs," and the "decision not to voir dire the jurors" may "constitute[] waiver."); *Olano*, 62 F.3d at 1190 (holding that defendant failed to establish actual prejudice from some jurors seeing him in handcuffs because he "did not examine the jury" and "adduced no other evidence probative of prejudice"); *United States v. Arias-Villaneuva*, 998 F.2d 1491, 1505 (9th Cir. 1993) (holding that, when defendants are "seen in custody by potential jurors during jury selection," "[q]uestioning the jurors is the best method of determining prejudice"), *overruled on other grounds by United States v. Jimenez-Ortega*, 472 F.3d 1102, 1103–04 (9th Cir. 2007).

Wiley asserts that she suffered actual prejudice "because the evidence of conspiracy was not overwhelming," and "[s]he was acquitted of distribution." She contends that "[h]ad the jury not surmised she was at least guilty of some crime . . . that required her to have something on her that beeped . . . she would not have been convicted of conspiracy." This argument amounts to conjecture at most. It ignores that conspiracy and distribution are distinct crimes with distinct elements, so there is no reason to assume prejudice played a role in the jury finding Wiley guilty of conspiracy and not guilty of distribution.

In fact, Wiley's acquittal on one count *weakens* the argument for actual prejudice because it suggests that the ankle monitor did not color the jury's perception of Wiley to such an extent that they were unable to consider impartially the evidence of her guilt. *See, e.g.*, *United States v. Young*, 470 U.S. 1, 18 n.15 (1985) ("The jury acquitted respondent of the most serious charge he faced . . . . This reinforces our conclusion that the prosecutor's remarks did not undermine the jury's ability to view the evidence independently and

fairly."); *United States v. Barragan*, 871 F.3d 689, 709 (9th Cir. 2017) ("And the jury acquitted [the defendant] of one of the two charges against him, indicating that they reviewed the evidence objectively.").

We have found evidence beyond mere speculative assertions inadequate to establish actual prejudice in a similar context. *See, e.g.*, *Williams*, 384 F.3d at 587–88 (concluding that alternate juror's statement that the number of security marshals at defendant's trial was greater than the norm did not permit a determination of actual prejudice). As a result, we cannot conclude that Wiley has proved actual prejudice here.

On the contrary, the removal of Wiley's ankle monitor during trial directly undercuts any notion that she was actually prejudiced. In *Halliburton*, the defendant argued he was prejudiced after some jurors, who were "aware that he had not been in custody *at the start of trial*" and "had seen him *earlier* move about without visible restraint, *later* briefly observed him in handcuffs outside the courtroom." 870 F.2d at 559 (emphases added). In other words, the defendant assumed he was prejudiced because the jurors believed that the court had decided it necessary to increase the government's control over him during trial.

Here, by contrast, the judge decreased the government's control over Wiley during trial: He ordered her ankle monitor removed, eliminating any restriction on her freedom of movement inside or outside the courtroom. We have noted that, where the jurors knew that the defendant was subject to a government restraint, but that restraint was subsequently removed, the removal "might well have had a favorable reaction with the jury rather than an adverse one." *Id.* at 561 (quoting *Bibbs v. Wyrick*, 526 F.2d 226, 228 (8th

Cir. 1975)); *cf. Wharton*, 765 F.3d at 965 ("[S]hackling during transport . . . could be perceived as *increasing* the dignity of the courtroom because a prisoner's shackles are removed for open-court proceedings."). By removing Wiley's ankle monitor, the judge exhibited a degree of trust in Wiley that was irreconcilable with her being dangerous. Therefore, the district judge's "appropriate curative measures eliminated the risk of actual prejudice to [Wiley's] right to a fair trial." *Halliburton*, 870 F.2d at 561.

## III.  CONCLUSION

Because ankle monitors are neither presumptively nor inherently prejudicial, and Wiley has failed to prove that she was actually prejudiced by her beeping ankle monitor, we uphold her conviction.

**AFFIRMED.**

---

MENDOZA, Circuit Judge, concurring in the judgment:

As appellate judges, we like questions of law. Unfortunately for us, we encounter many cases where the facts prevent us from reaching them. In those cases, we ordinarily cool our jets and resolve the issues on the facts, without announcing new and unnecessary rules of law. This should have been one such case. Here, Wiley asks us to determine whether the ankle monitor that she wore during her criminal trial violated her right to due process. The record, however, does not reflect that any juror perceived Wiley's ankle monitor. That glaring hole in the record forecloses Wiley's due process argument and should have ended our analysis.

But the majority cannot help itself.  Rather than adjudicate the case on the record before us, it assumes a material fact: that at least one juror was aware of Wiley's ankle monitor.  It proceeds to announce not one but *two* rules of constitutional law.  I disagree with the majority's decision to assume such a critical fact in an effort to reach a due process issue.  But the majority makes matters worse in its handling of that due process issue.  It concludes that an ankle monitor is not a "shackle" within the meaning of *Deck v. Missouri*, 544 U.S. 622 (2005), and that it is not an inherently prejudicial trial practice.  Although I generally agree that an ankle monitor is not quite a "shackle," I conclude that a perceptible ankle monitor is inherently prejudicial.  After all, an ankle monitor is a distinctive and stigmatizing device that brands the defendant as an especially dangerous or culpable person.  Because of that, it undermines the presumption of innocence and erodes the fairness of the fact-finding process.

## I.

The majority assumes that at least one juror was aware of Wiley's beeping ankle monitor.  That assumption lacks even a modicum of support in the record.  The record shows that Wiley's attorney flagged the beeping monitor before jury selection and indicated that he was "afraid that [it] would be prejudicial to the jury."  The trial judge said that he could hear the beeping from the bench.  The beeping continued into jury selection.  At a sidebar, Wiley's counsel expressed concern that the prospective jurors could hear the monitor beeping and see him fiddling with it.  A few minutes later the court took a recess and Wiley's ankle monitor was removed.  That is the extent of our record evidence.

This is not a case where the trial judge told the jury about the ankle monitor. *Cf. Larson v. Palmateer*, 515 F.3d 1057, 1062 (9th Cir. 2008) (addressing a habeas petitioner's argument that he was impermissibly made to wear a leg brace during his trial where the trial judge told the jury he "ha[d] been wearing a leg brace . . . . You saw it."). It is also not a case where counsel commented on the monitor during trial. *Cf. Williams v. Woodford*, 347 F.3d 567, 587 (9th Cir. 2004). We do not have testimony or declarations from jurors indicating that they saw the monitor either. *Cf. Ghent v. Woodford*, 279 F.3d 1121, 1132–33 (9th Cir. 2002); *Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999) [hereinafter *Rohden II*]. Put simply, we have *nothing* concrete that would allow us to find—or even plausibly infer—that at least one juror heard the beeping and understood it to be coming from Wiley's ankle monitor.

If anything, the record supports a finding that the jurors were *unaware* of Wiley's ankle monitor. When the trial judge and counsel discussed the ankle monitor at the sidebar conference during jury selection, the judge stated that he could hear the beeping, but indicated that he did not "think anyone really knows what that sound is." That was a safe assumption on the trial judge's part. As the United States put it at oral argument, federal courtrooms are "wired up." Today, courtrooms are filled with technology that can alert, like computers, printers, microphones, and telephones. Even if a juror heard Wiley's ankle monitor beeping, it seems unlikely that the juror would know it was coming from an ankle monitor while sitting in a courtroom filled with other devices capable of beeping.

But the majority breezes past all of this. Instead, it implies that a prospective juror had a hard time hearing the trial judge because Wiley's ankle monitor was beeping. But

that mischaracterizes the record. At the start of jury selection, the trial judge asked the prospective jurors if anyone was having a hard time hearing the court or counsel. One perspective juror raised his hand and indicated that he was having a hard time hearing "[j]ust some of them." Once jury selection was underway, a second prospective juror indicated that he was having a hard time hearing the judge even though the court had provided him with assistive headphones. Later, that same prospective juror continued to have issues with the headphones and hearing. At that point, the court called a brief recess to "see if we can make this device"—*i.e.*, the juror's headphones—"work better." During that recess, the court and counsel discussed the prospective juror's headphones. The court also used that recess as a convenient opportunity to have Wiley's ankle monitor removed. At no point did *any* prospective juror suggest that he or she was having a hard time hearing the court because of Wiley's beeping ankle monitor.

If the majority had construed the record properly, it would have found that there was no evidence suggesting that a juror was aware of the ankle monitor. Its analysis should have stopped there. Indeed, we have declined to reach similar issues in cases where there is no record of juror awareness. *See Rhoden v. Rowland*, 10 F.3d 1457, 1460 (9th Cir. 1993) (remanding a habeas petitioner's shackling claim where the state court "never gave him an adequate opportunity to demonstrate whether or not the jurors saw the shackles"); *see also id.* at 1462 (O'Scannlain, J., specially concurring) (indicating that the "case turns on whether the jury saw that the petitioner was shackled," which was a "material fact"). Our sister circuits have done the same in ankle monitor cases lacking a record of juror awareness. *See Higgins v. Addison*, 395 F. App'x 516, 519 (10th Cir. 2010)

(declining to issue a certificate of appealability because "nothing in the record . . . suggested the monitor was visible to the jury"); *White v. United States*, 2023 WL 7550935, at *4 (6th Cir. Oct. 17, 2023) (declining to issue a certificate of appealability because the petitioner did "not allege that the jury saw (or could have seen) the monitor" or "demonstrate[] that the jury even heard the alarm or recognized that it was emanating from his monitor").

The majority would have been wise to do the same. Our role in these cases is to identify courtroom practices that may impermissibly influence a jury's judgment and "undermine[] the presumption of innocence and the related fairness of the factfinding process." *Deck*, 544 U.S. at 630. Our entire focus is on preserving the jury's impartiality and ensuring that a defendant's "guilt or innocence [is] determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion . . . or other circumstances not adduced as proof." *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986) (quoting *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978)). But what the jury does not know cannot cloud its judgment. There is no reason to address whether a courtroom practice prejudiced the jury if the jury was unaware of that practice in the first instance.

The facts here do not allow us to reach Wiley's due process argument and that should have been the end of the story. After all, assuming material facts to reach constitutional issues "run[s] contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (cleaned up).

Indeed, "[i]f it is not necessary to decide more to dispose of a case, then it is necessary *not* to decide more." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 348 (2022) (Roberts, C.J., concurring in the judgment). But because the majority assumes a material fact and reaches the underlying due process issue, I am compelled to as well.

## II.

The majority tackles Wiley's due process argument from two angles. First, it establishes that *Deck*'s rule against visible shackling does not extend to ankle monitors. Second, and separately, it asserts that an ankle monitor is not an inherently prejudicial trial practice under *Holbrook*. I generally agree with the majority that an ankle monitor is not quite a "shackle" within *Deck*'s meaning. But I cannot endorse its rule that an ankle monitor is not an inherently prejudicial trial practice. In my view, an ankle monitor is a distinctive and stigmatizing device that brands the defendant as an especially dangerous and culpable person. It creates "an unacceptable risk" that "impermissible factors" will "com[e] into play" and undermine the jurors' fair-minded decision-making. *Holbrook*, 475 U.S. at 570 (quoting *Estelle v. Williams*, 425 U.S. 501, 505 (1976)).

The majority's inherent-prejudice analysis rests primarily on *Holbrook*. The Court in *Holbrook* considered whether the conspicuous deployment of security personnel during a trial is an inherently prejudicial practice. 475 U.S. at 569. In handling that issue, the Court situated itself against two of its prior decisions: *Illinois v. Allen*, 397 U.S. 337 (1970), and *Estelle*, 425 U.S. at 501. In *Allen*, the Court observed that "the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant" and that the "technique is itself something of an affront to

the very dignity and decorum of judicial proceedings." 397 U.S. at 344. Similarly, in *Estelle*, the Court held that a defendant cannot be compelled to appear before the jury in identifiable prison attire. 425 U.S. at 512–13. With *Allen* and *Estelle* in mind, the Court in *Holbrook* considered "whether the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial is the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." 475 U.S. at 568–69.

The Court's analysis in *Holbrook* was straightforward. It took the shackles from *Allen* and the jumpsuit from *Estelle* as benchmarks of prejudicial courtroom practices and considered whether conspicuous security personnel were similarly prejudicial. The Court concluded that they were not. 475 U.S. at 569. The Court noted that the "chief feature that distinguishes security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence." *Id.* For example, a juror could "easily believe" that the troopers were in the courtroom "to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence," and would not see the troopers "as a sign that [the defendant] is particularly dangerous or culpable." *Id.* The Court added that "society has become inured to the presence of armed guards in most public places" and "they are doubtless taken for granted." *Id.*

But the majority invokes *Holbrook* only to ignore its reasoning. Rather than meaningfully engage in a comparative analysis like the *Holbrook* Court, the majority makes the conclusory assertion that ankle monitors are "not in the same galaxy as prison clothes or shackles."

Hyperboles aside, I disagree with the majority; there are many similarities among shackles, prison attire, and ankle monitors. In my view, a straightforward comparative analysis leads to the conclusion that, like shackles and prison attire, perceptible ankle monitors are inherently prejudicial.

To begin, like a shackle or a prison jumpsuit, an ankle monitor is a "distinctive" courtroom practice. *Estelle*, 425 U.S. at 504. Most everyday people do not wear ankle monitors by choice, especially to court. Ankle monitors are neither particularly fashionable nor useful to the wearer, like a watch might be. Thus, when a defendant wears an ankle monitor to court, it distinguishes her from everybody else in the courtroom. She stands out because of the unique and conspicuous accessory strapped to her ankle, which she did not pick out at Claire's.

Further, like shackles and prison attire, ankle monitors are "identifiable" for their association with the criminal justice system. *Estelle*, 425 U.S. at 504. Ankle monitors are a quintessential "state-sponsored courtroom practice[]." *See Carey v. Musladin*, 549 U.S. 70, 76 (2006). That is, in the federal system, a court may require a defendant to wear an ankle monitor as a condition of pretrial release (as was true here). *See* 18 U.S.C. § 3142(c)(1)(B)(xiv). Everyday people understand that and, therefore, readily associate the device with the criminal justice system.

Of course, not every courtroom practice that "single[s] out" a defendant in a courtroom is inherently prejudicial. *Holbrook*, 475 U.S. at 567. An ankle monitor, however, does more than merely single out the defendant as someone involved in the justice system; it marks her as a "particularly dangerous or culpable person." *Id.* at 569. When a juror sees a defendant in an ankle monitor, she understands that it

is no accident.  She recognizes that the court has made the defendant wear the ankle monitor for a reason.  She may have some sense that federal courts impose electronic monitoring to promote public safety and to deter the defendant from absconding.  *See* 18 U.S.C. § 3142(c)(1). She will know that the monitor does not reflect positively on the defendant, and she will infer that the defendant is wearing the ankle monitor because the defendant is "dangerous or untrustworthy." *Dyas v. Poole*, 317 F.3d 934, 937 (9th Cir. 2003) (quoting *Rhoden II*, 172 F.3d at 636).[1]

Put simply, like a shackle or prison jumpsuit, an ankle monitor is not value neutral.  It is not some everyday accessory like a Fitbit or an Apple Watch.  It is a state-imposed restraint that conveys a potent and injurious message about the person wearing it.  That message perverts the jurors' impressions of the defendant.  In so doing, it impermissibly undermines the presumption of innocence and the defendant's right to a fair trial.  Although an ankle monitor is not exactly a shackle or prison attire, it presents the same high and unacceptable risk of prejudice.  We "must be alert to factors that may undermine the fairness of the fact-

---

[1] Electronic monitoring is much more nuanced than most people understand. *See generally* Samuel R. Wiseman, *Pretrial Detention and the Right to be Monitored*, 123 Yale L.J. 1344 (2014); Crystal S. Yang, *Toward an Optimal Bail System*, 92 N.Y.U. L. Rev. 1399 (2017).  Not all monitors are created equal, and they can be used to enforce vastly different pretrial release conditions.  Some monitors, like Secure Continuous Remote Alcohol Monitors ("SCRAMs"), have nothing to do with location at all.  The problem is that many ankle monitors look the same.  *See* Lauren Kilgour, *The Ethics of Aesthetics: Stigma, Information, and the Politics of Electronic Ankle Monitor Design*, The Information Soc'y 131, 138 (2020).  Thus, observers tend to lump all people who wear ankle monitors into one category of "dangerous criminal[s]." *Id.* at 139.

finding process," and an ankle monitor is one such factor. *Estelle*, 425 U.S. at 503.

But the majority is blind to that reality; it would have us believe that an ankle monitor is not all that prejudicial. First, the majority contends that an ankle monitor is not prejudicial because it does not suggest that the justice system sees a need to separate the defendant from the community. But the majority fundamentally misunderstands how ankle monitors are used as an aspect of pretrial supervision. Different monitors record and transmit data in dissimilar ways. *See* Wiseman, 123 Yale L.J. at 1365–66. Different monitors are also used in conjunction with a variety of other pretrial release conditions. Some monitors are used to enforce curfews; others are not. *Id.* Some monitors permit a wide range of movement, while others are used to keep a defendant at home. *Id.* at 1367. When imposed in conjunction with home confinement, ankle monitors are used to separate a defendant from the community. *See Deck*, 544 U.S. at 630 (quoting *Holbrook*, 475 U.S. at 569). And for that reason, an ankle monitor can send the message "that the justice system itself sees a 'need to separate a defendant from the community at large.'" *Id.*

The majority also downplays an ankle monitor's prejudicial impact by suggesting that it is "less intrusive" than other prejudicial practices. But the majority confuses disruption and prejudice. A small thing can have a large prejudicial impact, just ask Hester Prynne and her scarlet letter or Oscar Wilde and his green carnation. Our precedent recognizes that. We have held that relatively discrete restraints are prejudicial, while foreboding courtroom practices are not. *Compare Rhoden II*, 172 F.3d at 637 (finding prejudice where the defendant wore leg chains at trial) *with Morgan v. Aispuro*, 946 F.3d 1462, 1465 (9th Cir.

1991) (determining that a "security courtroom" with a "wire-reinforced glass partition and bars separating the spectator area from the court area" was not inherently prejudicial). These cases highlight that relatively unobtrusive courtroom practices can nevertheless have an outsized impact on jurors. And the same holds true when it comes to ankle monitors. Although ankle monitors are relatively small, they can have a disproportionate impact on the jury and create "an unacceptable risk" that "impermissible factors" will "com[e] into play" and cloud the jurors' judgment. *Holbrook*, 475 U.S. at 570.

Because ankle monitors are a distinctive and identifiable courtroom practice, there is not a "wide[] range of inferences that a juror might reasonably draw from" perceiving one. *Holbrook*, 475 U.S. at 569. When a juror is aware that a defendant is wearing an ankle monitor, the message is clear: the justice system sees some need to surveil and restrain the defendant because of the threat that she poses. There is no alternate, non-prejudicial inference that the juror could reasonably draw from seeing the defendant in an ankle monitor. And certainly no juror would believe that a defendant is wearing an ankle monitor on account of good behavior or character.

In this regard, ankle monitors are quite unlike the generalized courtroom security measures that we have encountered in other cases. We have routinely held that generalized courtroom security measures are not inherently prejudicial. *See Hayes v. Ayers*, 632 F.3d 500, 522 (9th Cir. 2011) (requiring spectators to go through a security screening before entering the courtroom is not inherently prejudicial); *Morgan*, 946 F.3d at 1465 (holding trial in a "security courtroom" is not inherently prejudicial). Our decisions in those cases make good sense. Generalized

security measures create a lower risk of prejudice because they do not impact the defendant any "more than any of the other participants in the trial." *Morgan*, 946 F.2d at 1465. Because they apply indiscriminately, the jury cannot infer that the defendant "specifically was the reason for the security measures." *Id.* But none of that is true when it comes to ankle monitors. An ankle monitor does not apply indiscriminately; it applies to one person in the courtroom: the defendant. Because the device is literally strapped to the defendant, the jury cannot mistake that the defendant "specifically was the reason" for the monitor's presence in the courtroom. *Id.*

Additionally, like shackles or prison jumpsuits, the public is not "inured" to ankle monitors, especially in a courtroom. *Holbrook*, 475 U.S. at 569. Electronic monitoring has become an increasingly common aspect of pretrial supervision, both in the state and federal systems. *See* Yang, 92 N.Y.U. L. Rev. at 1477. But that does not mean that everyday people are accustomed to ankle monitors or take them "for granted" as they would a security guard in a courtroom. *Holbrook*, 475 U.S. at 569. To the contrary, ankle monitors are things of popular intrigue. They are regularly depicted in movies and on television shows.[2] They go viral on social media.[3] They make the news, especially

---

[2] *See* Disturbia (Paramount Pictures 2007) (depicting a young man on home confinement with an ankle monitor); White Collar (Fox Production Studios 2009) (following a convicted con artist who obtains early release from prison to assist law enforcement in investigating suspected white collar criminals, but is made to wear an ankle monitor).

[3] *See* Tik Tok, @legbootlegit, https://www.tiktok.com/@legbootlegit/video/7262087314749312299

when attached to people in the public eye.[4]  Unlike the court security officers at issue in *Holbrook*, ankle monitors are the exact type of courtroom practice that catch jurors' attention in a courtroom.

For all these reasons, ankle monitors, like shackles and prison attire, "tend[] to brand" the defendant and create a great risk of prejudice. *Holbrook*, 475 U.S. at 571.  That risk of prejudice is especially troubling because it is not justified by any "essential state policy." *Estelle*, 425 U.S. at 505.  We impose pretrial electronic monitoring to promote public safety and ensure that defendants show up to court.  *See* 18 U.S.C. § 3142(c)(1).  Those are certainly legitimate interests while the defendant is out in the community.  But those interests largely fall away when the defendant is in the courtroom.  In that moment, the state is certain that the defendant will come to court—indeed, she is sitting right there—and can be confident that she is not harming the public.  Compelling a defendant to wear an ankle monitor before the jury is, at best, "convenient" for the government. *Estelle*, 425 U.S. at 505.  It prevents the government from needing to remove the monitor before trial and might assist in locating the defendant if she absconds mid-trial.  But those limited conveniences "provide[] no justification for the practice" in the courtroom.  *Id.*

---

(last visited May 17, 2024) (video of a spoof advertisement for a children's toy, "My First Ankle Monitor," with over 3 million likes).

[4] *See* Tom Hays et al., *Weinstein Accused of Misusing Ankle Monitor; $5M Bail Sought*, Associated Press, https://apnews.com/article/us-news-ap-top-news-harvey-weinstein-ca-state-wire-entertainment-08be9499da92e918c21ed84479b75acb (last visited May 17, 2024).

\*                    \*                    \*

This case never should have been resolved this way. The record does not allow us to reach Wiley's due process argument, and our analysis should have ended there. But the majority boldly strides ahead to hold that an ankle monitor is not an inherently prejudicial courtroom practice. The majority's attempts to downplay an ankle monitor's deleterious impact are understandable. As judges, we are accustomed to seeing defendants clad in shackles and prison attire, so we do not blink at ankle monitors. But our perspective as jurists is not what matters here. Our task is to "look at the scene presented to *jurors*." *Holbrook*, 475 U.S. at 572 (emphasis added). We ask whether "reason, principle, and common human experience" suggest that those everyday jurors will become prejudiced against the defendant. *See Estelle*, 425 U.S. at 504. The majority fails to understand that ordinary people are not accustomed to ankle monitors or the harmful messages that they convey. When a juror perceives an ankle monitor, it stands out and readily brands the defendant as someone dangerous and untrustworthy. For that reason, an ankle monitor "pose[s] an unacceptable threat to [the] defendant's right to a fair trial." *Holbrook*, 475 U.S. at 572. I respectfully disagree with the majority's suggestions otherwise.